JAMES Y. PAK (SBN 304563)
james.pak@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

MICHAEL W. McTIGUE JR. (*pro hac vice*)
michael.mctigue@skadden.com
MEREDITH C. SLAWE (*pro hac vice*)
meredith.slawe@skadden.com
ANDREW D. QUINN (*pro hac vice*)
andrew.quinn@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Attorneys for Defendant,
NBA Properties, Inc.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JAMES WHALEN and VICTOR FUENTES, individually and on behalf of all similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NBA PROPERTIES, INC.,<br><br>Defendant. | CASE NO.: 4:25-cv-01030-CRB<br><br>**DEFENDANT NBA PROPERTIES, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL INDIVIDUAL ARBITRATION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on June 20, 2025 at 10:00 A.M. (Zoom), in the courtroom of the Honorable Charles R. Breyer, located at 450 Golden Gate Avenue, Courtroom 6, 17th Floor, San Francisco, California 94102, Defendant NBA Properties, Inc. ("NBA") will move the Court to compel individual arbitration of Plaintiffs' claims pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*.

This motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Kenny Ebanyat, the [Proposed] Order, any oral argument heard by the Court, and such other matters as the Court may consider.

DATED: April 28, 2025

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ *James Y. Pak*
James Y. Pak

## TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION .......... ii

SUMMARY OF ARGUMENT .......... 1

BACKGROUND .......... 2

I. TO PURCHASE LEAGUE PASS, USERS MUST AGREE TO THE SUBSCRIBER AGREEMENT AND TERMS OF USE .......... 2

A. Plaintiff Fuentes Agreed to the Subscriber Agreement and Terms of Use in November 2022 .......... 3

B. The NBA Updated the 2021 Terms of Use on February 20, 2023. and Provided Direct Email Notice to Plaintiff Fuentes .......... 4

C. The June 2023 Updated Subscriber Agreement .......... 5

D. Plaintiff Whalen Agreed to the Subscriber Agreement and Terms of Use in October 2023 .......... 6

II. THE 2023 TERMS OF USE CONTAIN AN ARBITRATION AGREEMENT REQUIRING ARBITRATION ON AN INDIVIDUAL BASIS WITH NAM .......... 7

LEGAL STANDARD .......... 8

ARGUMENT .......... 9

I. PLAINTIFFS ARE BOUND BY THE ARBITRATION AGREEMENT .......... 9

A. Upon Purchasing League Pass, Plaintiffs Agreed to the Subscriber Agreement .......... 9

B. The Subscriber Agreement Clearly and Unequivocally Incorporated by Reference the Terms of Use .......... 11

C. Plaintiffs' Claims Are Governed by the Arbitration Agreement .......... 13

II. THIS ACTION MUST BE STAYED PENDING ARBITRATION .......... 15

CONCLUSION .......... 15

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Allied-Bruce Terminix Cos. v. Dobson*,
513 U.S. 265 (1995) ........ 8

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ........ 8

*AT&T Technologies, Inc. v. Communications Workers of America*,
475 U.S. 643 (1986) ........ 13

*Board of Trustees of IBEW Local No. 640 v. Cigna Health & Life Insurance Co.*,
No. 21-16424, 2022 WL 2805111 (9th Cir. July 18, 2022) ........ 14

*Berman v. Freedom Financial Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ........ 9

*Brooks v. WarnerMedia Direct, LLC*,
No. 23 Civ. 11030 (KPF), 2024 WL 3330305 (S.D.N.Y. July 8, 2024) ........ 13

*Clements v. T-Mobile USA, Inc.*,
712 F. Supp. 3d 1290 (N.D. Cal. 2024) ........ 14

*Crawford v. Beachbody, LLC*,
No. 14cv1583-GPC(KSC), 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014) ........ 10

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) ........ 8

*Dipito LLC v. Manheim Investments, Inc.*,
No. 3:21-cv-01205-H-JLB, 2021 WL 5908994 (S.D. Cal. Dec. 14, 2021) ........ 9

*Dohrmann v. Intuit, Inc.*,
823 F. App'x 482 (9th Cir. 2020) ........ 10

*Ghazizadeh v. Coursera, Inc.*,
737 F. Supp. 3d 911 (N.D. Cal. 2024) ........ 10

*Gilmer v. Interstate/Johnson Lane Corp.*,
500 U.S. 20 (1991) ........ 8

*Government Employees Insurance Co. v. Mount Prospect Chiropractic Center*,
98 F.4th 463 (3d Cir. 2024) ........ 8

*Gulf Oil Corp. v. Copp Paving Co.*,
419 U.S. 186 (1974) ........ 8-9

*Kamath v. Coinbase, Inc.*,
No. 23-cv-03533-CRB, 2024 WL 950163 (N.D. Cal. Mar. 5, 2024) ........................................ 12-13

*Keebaugh v. Warner Bros. Entertainment Inc.*,
100 F.4th 1005 (9th Cir. 2024) ........................................................................................ 1, 10, 11

*Kleveland v. Chicago Title Insurance Co.*,
141 Cal. App. 4th 761 (2006) ........................................................................................ 11

*Lamps Plus, Inc. v. Varela*,
139 S. Ct. 1407 (2019) ........................................................................................ 13

*Meyer v. Uber Technologies, Inc.*,
868 F.3d 66 (2d Cir 2017) ........................................................................................ 9

*Oberstein v. Live Nation Entertainment, Inc.*,
60 F.4th 505 (9th Cir. 2023) ........................................................................................ 9, 10, 11

*Sadlock v. Walt Disney Co.*,
No. 22-cv-09155-EMC, 2023 WL 4869245 (N.D. Cal. July 31, 2023) ........................................ 13

*Schoenduve Corp. v. Lucent Technologies, Inc.*,
442 F.3d 727 (9th Cir. 2006) ........................................................................................ 14

*Shalomayev v. Altice USA, Inc.*,
No. 21-CV-5540 (MKB), 2022 WL 2359406 (E.D.N.Y. June 30, 2022) ...................................... 11

*Smith v. Spizzirri*,
601 U.S. 472 (2024) ........................................................................................ 15

*Swift v. Zynga Game Network, Inc.*,
805 F. Supp. 2d 904 (N.D. Cal. 2011) ........................................................................................ 10

*In re Uber Technologies, Inc.*,
No. ML 18-2826 PSG (GJSx), 2019 WL 6317770 (C.D. Cal. Aug. 19, 2019) ............................... 13

*Vasell v. SeatGeek, Inc.*,
No. 24-CV-00932 (NCM), 2025 WL 240912 (E.D.N.Y. Jan. 17, 2025) ...................................... 14

*Wilson v. Hatch Bank*,
No. 23cv813-JES (MPP), 2024 WL 1355492 (S.D. Cal. Mar. 29, 2024) ........................... 11, 12, 13

**STATUTES**

9 U.S.C. § 1 ........................................................................................ 8

9 U.S.C. § 2 ........................................................................................ 8

9 U.S.C. § 3 ........................................................................................ 15

## SUMMARY OF ARGUMENT

Plaintiffs should be compelled to arbitrate their claims in National Arbitration and Mediation ("NAM") on an individual basis because they manifested assent to a broad arbitration agreement requiring that their privacy claims be arbitrated. But, as set forth in Defendant NBA Properties, Inc.'s ("NBA") motion to transfer, this action should first be transferred to the U.S. District Court for the Southern District of New York ("SDNY") because Plaintiffs agreed to, and are bound by, a forum selection clause providing that this action must be heard in New York.

***First***, Plaintiffs concede that they subscribed to League Pass, the NBA's direct-to-consumer, subscription-based product offering. Before Plaintiffs completed their purchase of League Pass, they were presented with a box that stated in the first sentence that "[b]y clicking 'Subscribe' you acknowledge that you have read and agree to the Subscriber Agreement." The "Subscriber Agreement" was an underlined link that opened to the text of the Subscriber Agreement. Both Plaintiffs clicked the "Agree and Subscribe" button. Courts have routinely enforced contracts in circumstances that provided the same, or even *less*, notice of the existence of an agreement. *See Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1020 (9th Cir. 2024) ("Directly beneath the operative Play button is the following: 'By tapping "Play" I agree to the Terms of Service' or 'By tapping "Play" I accept the Terms of Use and acknowledge the Privacy Policy'"). The Subscriber Agreement clearly and unequivocally linked to, and incorporated, the Terms of Use containing the arbitration clause designating NAM as the arbitration administrator.

***Second***, the arbitration agreement applies to Plaintiffs' claims. The arbitration agreement applies to any "Dispute" between Plaintiffs and the NBA, which should be "interpreted broadly" to include "a dispute, claim, or controversy **arising out of or in connection with your access to, and/or use of, the Site**, **and/or the provision of content, services, and/or technology on or through the Site, and/or your relationship with us**." (Ex. 4 at 20.) Plaintiffs' claims are entirely premised on their use of the NBA's mobile app "NBA: Live Games & Scores" ("App") and the alleged third-party disclosures thorough the App. Plaintiffs must resolve these disputes in individual arbitration before NAM.

The NBA respectfully requests that if the Court does not transfer this action to the SDNY, that Plaintiffs be compelled to arbitrate their claims on an individual basis before NAM.

## BACKGROUND

As described below, on October 28, 2023, Plaintiff Whalen affirmatively agreed to the Subscriber Agreement dated June 2023 ("2023 Subscriber Agreement," Ex. 5). (Declaration of Kenneth Ebanyat In Support of Defendant's Motion to Transfer Venue and Motion to Compel Arbitration, filed herewith ("Decl.") ¶ 24.) The 2023 Subscriber Agreement expressly incorporates by reference the NBA's Terms of Use dated February 20, 2023 ("2023 Terms of Use," Ex. 4), and contains an arbitration agreement requiring arbitration on an individual basis before NAM. On November 28, 2022, Plaintiff Fuentes affirmatively agreed to the Subscriber Agreement dated September 12, 2022 ("2022 Subscriber Agreement," Ex. 2). (Decl. ¶ 29.) The 2022 Subscriber Agreement expressly incorporates by reference the NBA's Terms of Use dated June 28, 2021 ("2021 Terms of Use," Ex. 3), which required arbitration on an individual basis before the American Arbitration Association ("AAA"), rather than NAM. Nevertheless, Plaintiff Fuentes received direct email notice of the 2023 Terms of Use containing the arbitration agreement requiring arbitration before NAM, which were also then incorporated into the 2022 Subscriber Agreement, and he continued to use the NBA's services after receiving this email. (Decl. ¶ 31-32.) The NBA brings this motion pursuant to the arbitration agreement in the 2023 Terms of Use.

### I. TO PURCHASE LEAGUE PASS, USERS MUST AGREE TO THE SUBSCRIBER AGREEMENT AND TERMS OF USE

League Pass is the NBA's direct-to-consumer, paid subscription-based product. (Decl. ¶ 3.) League Pass grants access to streams of live games, allows subscribers to stream previously recorded games on-demand in full or a condensed format, and offers additional content, such as news, analysis, and highlights. (*Id.* ¶ 4.) Since November 28, 2022, there have been two subscriptions available: (1) League Pass and (2) League Pass Premium. (*Id.*) To purchase League Pass, users must create or log in to their NBA account with an email address and password. (*Id.* ¶ 6.) After logging in, users are presented with a "Billing Info" webpage that requires them to provide a method of payment. (*Id.* ¶ 7; Ex. 1.) Underneath the method of payment field is an "Order Summary" box. The "Order Summary" box lists the price of the subscription, and prominently informs users of the following:

***Figure 1: Order Summary Box Presenting Subscriber Agreement***




(Decl. ¶¶ 7-9 and Fig. 1; Ex. 1.) The term "Subscriber Agreement" is underlined, hyperlinked, and leads to https://www.nba.com/subscriberagreement. (Decl. ¶ 10 and Fig. 1.) Users must affirmatively agree to the Subscriber Agreement by clicking the "Agree and Subscribe" button before they complete their transaction and purchase League Pass. (*Id.* ¶ 7.)

**A. Plaintiff Fuentes Agreed to the Subscriber Agreement and Terms of Use in November 2022**

Plaintiff Fuentes alleges that "[i]n or about November 2022, [he] downloaded the NBA App on his Android mobile phone . . . subscribed to the League Pass Premium and created an NBA account for the purpose of accessing the NBA League Pass Premium." (Compl. ¶ 114.) The NBA's business records confirm this. They reflect that, on November 28, 2022, Plaintiff Fuentes logged into an NBA.com account and purchased a League Pass subscription from an internet browser. (Decl. ¶ 29.) In connection with that purchase, Plaintiff Fuentes was presented with the Subscriber Agreement on the "Billing Info" webpage as shown in Figure 1, and affirmatively clicked "Agree and Subscribe." (*Id.*) At that time, the "Subscriber Agreement" hyperlink shown in Figure 1 led users to the Subscriber Agreement dated September 12, 2022 (2022 Subscriber Agreement). (Decl. ¶ 10; Ex. 2.)

The 2022 Subscriber Agreement expressly incorporated by reference, and provided prominent links to, the Terms of Use dated June 28, 2021 ("2021 Terms of Use"). (Decl. ¶¶ 12-13; Ex. 3.) Specifically, the 2022 Subscriber Agreement contained two hyperlinks (in blue and underlined below) to the 2021 Terms of Use and the NBA.com Privacy Policy, and stated, in relevant part, the following:

> THIS SUBSCRIBER AGREEMENT ("Agreement" OR "Subscriber Agreement"), ALONG WITH THE DOCUMENTS REFERENCED HEREIN, GOVERNS YOUR USE OF AND ACCESS TO EACH SERVICE. THIS SUBSCRIBER AGREEMENT IS A LEGAL AGREEMENT BETWEEN YOU AND US. BY ACCESSING A SERVICE, YOU AGREE TO BE BOUND BY THIS SUBSCRIBER AGREEMENT AND THE DOCUMENTS REFERRED TO HEREIN, INCLUDING, BUT NOT LIMITED TO, THE SITE TERMS OF USE AND THE NBA.COM NETWORK PRIVACY POLICY. . . .
>
> . . .
>
> **PRIVACY POLICY AND SITE TERMS OF USE**
>
> You agree to the Site Terms of Use (the "Terms"), posted at https://nba.com/termsofuse and the NBA.com Network Privacy Policy ("Privacy Policy"), posted at https://nba.com/privacy-policy. We may change the Terms and/or the Privacy Policy from time to time. To the extent of any conflict between the terms or conditions of this Agreement and the terms or conditions of the Terms and/or Privacy Policy, the terms and conditions of this Agreement will govern. **Without limiting the generality of the foregoing, you acknowledge that you have read and agree to the Terms and the Privacy Policy, and you understand that your subscription and your use of the Service is subject to the Privacy Policy and the Terms, including, without limitation, the Terms' clauses titled "DISCLAIMER OF WARRANTIES AND DAMAGES; LIMITATION OF LIABILITY", "AGREEMENT TO ARBITRATE", and "CLASS ACTION WAIVER"**.

(Decl. ¶ 12-13; Ex. 2 at 1-2.) The 2022 Subscriber Agreement also provided users with notice that the NBA "may change the Terms and/or the Privacy Policy from time to time." (Ex. 2 at 2.)

### B. The NBA Updated the 2021 Terms of Use on February 20, 2023. and Provided Direct Email Notice to Plaintiff Fuentes

The 2021 Terms of Use apply to "use of the NBA's digital platforms, including NBA websites, apps (e.g., mobile apps, tablet apps) and online content offerings." (Ex. 3 at 1.) The 2021 Terms of Use also provide:

> These Terms of Use may be amended or modified, or new conditions may be imposed, at any time. Any such changes or additions will be reflected by an update of this posting. Please check these Terms of Use periodically for changes. Your continued use of the Site [defined as the "Web Site," "associated NBA apps," "and/or associated content offerings"] following the posting of changes to these terms (including the Privacy Policy) will mean you accept those changes and that such changes shall apply to Your use of the Site after such changes have been posted.

(Ex. 3 at 2.)

On February 20, 2023, the NBA posted an update to the Terms of Use at

https://www.nba.com/termsofuse (2023 Terms of Use). (Decl. ¶ 16; Ex. 4.) In this posted update, the Terms of Use link in the 2022 Subscriber Agreement led to the 2023 Terms of Use.

In addition, between February 22 and 23, 2023, the NBA provided direct email notice of the update to all current and former NBA.com account holders and all current and former League Pass subscribers ("February 2023 Notice Email"). The email subject line was "Updates to Our Terms of Use." The email body stated the following, and contained a prominent hyperlink (in blue below) to the 2023 Terms of Use:

> We've Updated Our Terms of Use.
>
> Because we value you as a fan, we want you to know that we've made updates to our Terms of Use, ***including information about procedures for resolving disputes with us***. The updated Terms of Use apply to:
>
> The NBA, our affiliate leagues, including the G League, 2K League, and Basketball Africa League, and associated teams, along with our websites and mobile apps.
>
> We encourage you to review all of the updated terms that apply to you.
>
> Your continued use of our websites and mobile apps is your agreement to these updated terms and policies. If you have questions, please contact us at TermsofUse@nba.com.
> Thank you for being a fan of the NBA.

(Decl. ¶ 17 and Fig. 2 (emphasis added).) The 2023 Terms of Use "apply to [the] access and use of the digital platforms of the National Basketball Association ('NBA') . . . including League websites . . . apps (e.g., mobile apps, tablet apps), and online content offerings (collectively, the 'Services')." (Ex. 4 at 1.)

Thus, the February 2023 Notice Email provided notice that: (i) the NBA "made updates to our Terms of Use, including information about procedures for resolving disputes with us," (ii) the February 2023 Terms of Use apply to the NBA's "websites and mobile app," and (iii) "continued use of [the NBA's] websites and mobile apps is your agreement to these updated terms and policies." The NBA sent the February 2023 Notice Email to all users who purchased a League Pass subscription before February 20, 2023. (Decl. ¶ 17.)

On February 23, 2023, Plaintiff Fuentes received the February 2023 Notice Email notifying him of the 2023 Terms of Use. (Decl. ¶ 30.) In the month after receiving the February 2023 Notice Email, Plaintiff Fuentes continued to access League Pass content on 15 different days. (*Id.* ¶ 31.).

### C. <u>The June 2023 Updated Subscriber Agreement</u>

In June 2023, the NBA updated the Subscriber Agreement for League Pass (2023 Subscriber Agreement). The NBA posted the 2023 Subscriber Agreement to its website at the link

https://www.nba.com/subscriberagreement. (Decl. ¶ 19; Ex. 5.) Like the 2022 Subscriber Agreement, the 2023 Subscriber Agreement expressly incorporated by reference the 2023 Terms of Use. In particular, the 2023 Subscriber Agreement included prominent hyperlinks to the 2023 Terms of Use and the dispute resolution provision contained in the 2023 Terms of Use (in blue below) and stated:

> THIS SUBSCRIBER AGREEMENT ("Agreement" OR "Subscriber Agreement"), ALONG WITH THE DOCUMENTS REFERENCED HEREIN, GOVERNS YOUR USE OF AND ACCESS TO EACH SERVICE. THIS SUBSCRIBER AGREEMENT IS A LEGAL AGREEMENT BETWEEN YOU AND US. BY ACCESSING A SERVICE, YOU AGREE TO BE BOUND BY THIS SUBSCRIBER AGREEMENT AND THE DOCUMENTS REFERRED TO HEREIN, INCLUDING, BUT NOT LIMITED TO, THE SITE TERMS OF USE AND THE NBA.COM NETWORK PRIVACY POLICY. . . .
>
> THIS SUBSCRIBER AGREEMENT INCORPORATES BY REFERENCE AN ARBITRATION AGREEMENT, A CLASS AND COLLECTIVE ACTION WAIVER, AND A JURY TRIAL WAIVER THAT AFFECT YOUR RIGHTS. . . . YOU HAVE AN OPPORTUNITY TO OPT OUT OF THE ARBITRATION AGREEMENT AS SET FORTH IN THE TERMS OF USE. PLEASE REVIEW THESE PROVISIONS CAREFULLY.
>
> . . .
>
> **PRIVACY POLICY AND SITE TERMS OF USE**
>
> You agree to the Site Terms of Use (the "Terms"), posted at https://nba.com/termsofuse and the NBA.com Network Privacy Policy ("Privacy Policy"), posted at https://nba.com/privacy-policy. We may change the Terms and/or the Privacy Policy from time to time . . . ***[Y]ou acknowledge that you have read and agree to the Terms and the Privacy Policy, and you understand that your subscription and your use of the Service is subject to the Privacy Policy and the Terms, including, without limitation, the Terms' clauses titled, "DISPUTE RESOLUTION; SMALL CLAIMS COURT; AGREEMENT TO ARBITRATE", "CLASS ACTION WAIVER; JURY TRIAL WAIVER"***

(Decl. ¶ 21; Ex. 5 at 1-2.) Thus, like the 2022 Subscriber Agreement, the 2023 Subscriber Agreement expressly incorporated the 2023 Terms of Use, including the dispute resolution provisions.

### D. Plaintiff Whalen Agreed to the Subscriber Agreement and Terms of Use in October 2023

Plaintiff Whalen alleges that "[i]n or about October 2023, [he] subscribed to the League Pass Premium and created an NBA account for the purpose of accessing the NBA League Pass Premium." (Compl. ¶ 107.) The NBA's records confirm this. They reflect that on October 28, 2023, Plaintiff Whalen logged into his NBA.com account and purchased a League Pass subscription from an internet browser. (Decl. ¶ 24.) In doing so, Plaintiff Whalen was presented with a link to the 2023 Subscriber Agreement on the "Billing Info" webpage as shown in Figure 1. He affirmatively clicked "Agree and Subscribe,"

demonstrating his assent to the 2023 Subscriber Agreement and the 2023 Terms of Use, including the arbitration agreement and other dispute resolution provisions. (*Id.*)

## II. THE 2023 TERMS OF USE CONTAIN AN ARBITRATION AGREEMENT REQUIRING ARBITRATION ON AN INDIVIDUAL BASIS WITH NAM

The first page of the 2023 Terms of Use prominently states that the agreement applies to their "use of the digital platforms of the [NBA] . . . including League websites including, but not limited to nba.com . . . [and] apps (e.g., mobile apps, tablet apps), and online content offerings" and that "THESE TERMS OF USE CONTAIN AN ARBITRATION AGREEMENT, A CLASS AND COLLECTIVE ACTION WAIVER, AND A JURY TRIAL WAIVER THAT AFFECT YOUR RIGHTS." (Ex. 4 at 1.) The dispute resolution provision, Section 17, contains the NBA's arbitration agreement and provides that "the Federal Arbitration Act governs the interpretation and enforcement of the arbitration provisions" and broadly defines "Dispute" as "a dispute, claim, or controversy arising out of or in connection with your access to, and/or use of, the Site, and/or the provision of content, services, and/or technology on or through the Site, and/or your relationship with us, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory [and] claims that arose before these Terms of Use or any prior agreement." (*Id.* at 20.) Plaintiffs agreed in the 2023 Terms of Use that "any Dispute that is not resolved through the Mandatory Pre-Dispute Resolution Process shall be resolved by binding arbitration to be held in the county or parish in which you reside." (*Id.* at 22.) Further, "[t]he arbitration shall be administered by National Arbitration and Mediation ('NAM') and heard by a single, neutral arbitrator" and the arbitrator may only award relief "in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim." (*Id.* at 22, 24.)

The 2023 Terms of Use also notified users, including Plaintiffs, on the first page that "YOU HAVE AN OPPORTUNITY TO OPT OUT OF THE ARBITRATION AGREEMENT AS SET FORTH BELOW." (Ex. 4 at 1.) Section 17 provided that Plaintiffs had "the right to opt out of arbitration by sending the Operator a personally signed, written notice of your decision to opt out via email to notice@nba.com within thirty (30) days of your first access or use of the Site." (*Id.* at 27.) The NBA's business records reflect that neither Plaintiff Whalen nor Plaintiff Fuentes opted out of the arbitration agreement in the 2023 Terms of Use. (Decl. ¶¶ 27, 33.)

Section 18 includes a class action waiver. It provides: "[t]o the fullest extent permitted by law, each party may bring claims (whether in court or in arbitration) against the other only in an individual capacity, and not participate as a plaintiff, claimant, or class member in any class, collective, consolidated, private attorney general, or representative proceeding." (Ex. 4 at 28.)

## LEGAL STANDARD

The Federal Arbitration Act, 9 U.S.C. §§ 1–16 ("FAA") provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As Congress has expressed a strong public policy favoring arbitration, courts must "rigorously enforce" arbitration agreements. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). Moreover, the FAA was enacted to "reverse the longstanding judicial hostility to arbitration agreements" and place "arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991); *see AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). Indeed, "[b]y its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter*, 470 U.S. at 218; *see also Gov't Emps. Ins. Co. v. Mount Prospect Chiropractic Ctr.*, 98 F.4th 463, 472 (3d Cir. 2024) ("When a movant sufficiently establishes that a claim is subject to a valid arbitration agreement, district courts have no discretion and must send it to arbitration.").

The FAA applies to any arbitration agreement that is (i) in writing and (ii) part of "a contract evidencing a transaction involving [interstate] commerce." 9 U.S.C. § 2. The arbitration agreement in the 2023 Terms of Use satisfies both conditions: (1) it is in writing; and (2) Plaintiff's claims arise out of Plaintiffs' use of the League Pass and App, which (i) facilitate viewing of programming and NBA games taking place around the country, and (ii) are offered by NBA, the New York corporation that is also party to the 2023 Terms of Use.[1] *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995) (interpreting the phrase "'involving commerce' as broadly as the words 'affecting commerce'"); *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195 (1974) ("[T]he flow of interstate commerce [includes] the generation of

---

[1] "Commerce" is defined broadly in the FAA to include "commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia." 9 U.S.C. § 1.

goods and services for interstate markets and their transport and distribution to the consumer."). The FAA governs the validity and enforceability of the arbitration agreement in the 2023 Terms of Use.

## ARGUMENT

## I. PLAINTIFFS ARE BOUND BY THE ARBITRATION AGREEMENT

Questions of contract formation involving an arbitration agreement are governed by state law principles. *See Dipito LLC v. Manheim Invs., Inc.*, No. 3:21-cv-01205-H-JLB, 2021 WL 5908994, at *11 (S.D. Cal. Dec. 14, 2021). The 2023 Terms of Use provide that "[t]hese Terms of Use and any Disputes between you and the [NBA] will be governed by the laws of the State of New York without regard to its principles of conflicts of laws." (Ex. 4 at 29.) Thus, the applicable law for determining contract formation should be New York, whose law explicitly governs the 2023 Terms of Use.

Plaintiffs may argue that California law should apply. But no choice of law analysis is necessary because there is no conflict between New York and California law with respect to contract formation. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) ("New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term." (citation omitted).) In either state, the key question is whether the parties manifested mutual assent to the contract. *See, e.g.*, *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) ("[U]nder New York or California law, the parties must manifest their mutual assent to the terms.").

As discussed below, Plaintiffs unambiguously assented to the Subscriber Agreement, with full notice of its terms. The Subscriber Agreement clearly and unequivocally incorporated by reference the 2023 Terms of Use. Plaintiffs, therefore, are both bound by the arbitration agreement in the 2023 Terms of Use.

### A. Upon Purchasing League Pass, Plaintiffs Agreed to the Subscriber Agreement

Both Plaintiffs unambiguously assented to the Subscriber Agreement. Under either California and New York law, a party is bound by a contract where "'(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.'" *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) (citation omitted); *accord Meyer*, 868 F.3d at 75.

Courts routinely conclude that hyperlinks to contract terms coupled with a button to acknowledge

agreement are sufficient notice and manifestation of assent. *See, e.g.*, *Keebaugh*, 100 F.4th at 1020 (enforcing agreement where "[d]irectly beneath the operative Play button is the following: 'By tapping 'Play' I agree to the Terms of Service' or 'By tapping 'Play' I accept the Terms of Use and acknowledge the Privacy Policy'"); *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484 (9th Cir. 2020) (notice and assent established where "Sign In" box directly above text states "[b]y clicking Sign In, you agree to the Turbo Terms of Use, TurboTax Terms of Use, and have read and acknowledged our Privacy Statement"); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 912 (N.D. Cal. 2011) (enforcing arbitration clause where plaintiff clicked "Accept" button placed above hyperlinked statement indicating that clicking the button constituted assent to terms); *Crawford v. Beachbody, LLC*, No. 14cv1583-GPC(KSC), 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014) (agreement formed where hyperlinked notice is directly above "Place Order" button). The same type of notice and assent took place here.

**Plaintiff Fuentes**. On November 28, 2022, after signing into his NBA.com account and initiating his purchase of the League Pass via a web browser, Plaintiff Fuentes was presented with an "Order Summary" box that stated in the first sentence: "By clicking 'Subscribe' you acknowledge that you have read and agree to the Subscriber Agreement." The "Subscriber Agreement" was an underlined link that opened to the text of the 2022 Subscriber Agreement. (Ex. 1.) Directly beneath the "Order Summary" box was a prominent "Agree and Subscribe" button which clearly indicated that, by clicking, Plaintiff Fuentes was agreeing to be bound by the Subscriber Agreement. Plaintiff Fuentes affirmatively clicked "Agree and Subscribe." (Decl. ¶ 29.)

The context of the transaction—an ongoing subscription with the NBA—indicated to Plaintiff Fuentes that there would be a continuing relationship with the NBA. This provided further notice that Plaintiff Fuentes would be bound by the Subscription Agreement. *See Oberstein*, 60 F.4th at 517 (users making online account through "full registration process" should expect "'some sort of continuing relationship' that [puts] users on notice for a link to the terms of that continuing relationship." (citation omitted)); *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 926 (N.D. Cal. 2024) ("users of . . . a platform that offers . . . educational courses via pre-recorded videos, would similarly expect (or should expect) their access to the platform would be continual and governed by some terms of use").

**Plaintiff Whalen**. On November 28, 2022, after signing into his NBA.com account and initiating

his purchase of League Pass, Plaintiff Whalen, like Plaintiff Fuentes, was presented with an "Order Summary" box that stated in the first sentence: "By clicking 'Subscribe' you acknowledge that you have read and agree to the Subscriber Agreement." The "Subscriber Agreement" was an underlined hyperlink that opened to the text of the 2023 Subscriber Agreement. (Ex. 1.) Directly beneath the "Order Summary" box was a prominent "Agree and Subscribe" button which clearly indicated that, by clicking, Plaintiff Whalen was agreeing to be bound by the Subscriber Agreement. Like Plaintiff Fuentes, Plaintiff Whalen affirmatively clicked "Agree and Subscribe." (Decl. ¶ 24.) In doing so, Plaintiff Whalen, like Plaintiff Fuentes, was agreeing to an ongoing subscription relationship with the NBA. As is the case with Plaintiff Fuentes, this is sufficient notice and assent to bind Plaintiff Whalen. *See, e.g.*, *Keebaugh*, 100 F.4th at 1019-20; *Oberstein*, 60 F.4th at 517 (continuing relationship provides further notice of binding nature of terms). Therefore, Plaintiff Whalen agreed to the 2023 Subscription Agreement.

**B. The Subscriber Agreement Clearly and Unequivocally Incorporated by Reference the Terms of Use**

Both the 2022 Subscriber Agreement and 2023 Subscriber Agreement expressly incorporated the 2023 Terms of Use. Parties may be bound by reference to other agreements so long as "'(1) the reference to another document was clear and unequivocal; (2) the reference was called to the attention of the other party, who consented to that term; and (3) the terms of the incorporated documents were known or easily available to the contracting parties.'" *Wilson v. Hatch Bank*, No. 23cv813-JES (MPP), 2024 WL 1355492, at *8 (S.D. Cal. Mar. 29, 2024) (quoting *Kleveland v. Chicago Title Ins. Co.*, 141 Cal. App. 4th 761, 765 (2006)); *Shalomayev v. Altice USA, Inc.*, No. 21-CV-5540 (MKB), 2022 WL 2359406, at *6 (E.D.N.Y. June 30, 2022) ("That the arbitration provision was incorporated in the February 2020 Agreement through reference to the General Terms of Service rather than being in the Agreement itself does not affect its enforceability").

**Plaintiff Fuentes**. As shown above, Part I.A, Plaintiff Fuentes agreed to the 2022 Subscriber Agreement. The 2022 Subscriber Agreement stated in the first paragraph: "BY ACCESSING A SERVICE [including League Pass], YOU AGREE TO BE BOUND BY THIS SUBSCRIBER AGREEMENT AND THE DOCUMENTS REFERRED TO HEREIN, INCLUDING, BUT NOT LIMITED TO, THE SITE TERMS OF USE." (Ex. 2 at 1.) It also provided a link to the Terms of Use in the fourth paragraph, which stated "You agree to the Site Terms of Use (the 'Terms'), posted at https://nba.com/termsofuse." (*Id.* at 2.)

The link led to the then-current Terms of Use. (Decl. ¶ 14.) Accordingly, the references to the Terms of Use in the 2022 Subscriber Agreement: "(1) were clear and unequivocal, (2) were called to Plaintiff's attention, and (3) because a hyperlink to [the 2021 Terms of Use] was conspicuously embedded into the [2022 Subscriber Agreement], [the 2021 Terms of Use] [were] known or readily available to Plaintiff." *Wilson*, 2024 WL 1355492, at *8 (separate policy incorporated by reference into a business's terms of use presented on the internet). Thus, the 2022 Subscriber Agreement to which Plaintiff Fuentes agreed clearly and unequivocally incorporated the Terms of Use.

Plaintiff Fuentes is also bound by the later-adopted 2023 Terms of Use. When consumers are provided direct email notice of updated terms of use and continue to use the business's services after receiving the notice, this is sufficient to provide reasonably conspicuous notice and unambiguously manifest assent. *See Kamath v. Coinbase, Inc.*, No. 23-cv-03533-CRB, 2024 WL 950163, at *4 (N.D. Cal. Mar. 5, 2024) (Breyer, J.) ("The email [notifying plaintiff of the updated terms] and Plaintiff's continued use of [defendant's] services is enough to establish reasonably conspicuous notice and assent to the [updated terms]"). The 2021 Terms of Use in place when Plaintiff Fuentes agreed to the 2022 Subscriber Agreement provided that the "Terms of Use may be amended or modified, or new conditions may be imposed, at any time." (Ex. 3 at 2.) Pursuant to this provision, the NBA updated the Terms of Use on February 20, 2023, and directly sent the February 2023 Notice Email describing the updated terms. On February 23, 2023, Plaintiff Fuentes received the February 2023 Notice Email which concisely informed him that: (i) the NBA "made updates to our Terms of Use, including information about procedures for resolving disputes with us," (ii) the February 2023 Terms of Use apply to the NBA's "websites and mobile app," and (iii) "continued use of [NBA's] websites and mobile apps is your agreement to these updated terms and policies." (Decl. ¶¶ 17-18.) After receiving the February 2023 Notice Email—and being told that continued use of NBA services would constitute assent—Plaintiff Fuentes proceeded to access League Pass content on 15 different days between February 23, 2023, and March 31, 2023. (*Id.* ¶ 31.)

There is no question that the February 2023 Notice Email provided conspicuous notice of the 2023 Terms of Use and that Plaintiff Fuentes' conduct manifested assent to those terms. Numerous courts have found that similar email notice and continued use unequivocally bound a plaintiff to an updated agreement. *See Kamath*, 2024 WL 950163, at *4 (plaintiff bound by updated agreement where plaintiff was "first

informed of the 2022 UA on January 25, 2022, when [defendant] emailed her about the upcoming changes to the [agreement]," "[t]he email was concise, providing only a handful of bullet points for users to read," and plaintiff continued to use defendant's services); *Sadlock v. Walt Disney Co.*, No. 22-cv-09155-EMC, 2023 WL 4869245, at *12 (N.D. Cal. July 31, 2023) (same); *In re Uber Techs., Inc.*, No. ML 18-2826 PSG (GJSx), 2019 WL 6317770, at *4 (C.D. Cal. Aug. 19, 2019) (same); *Brooks v. WarnerMedia Direct, LLC*, No. 23 Civ. 11030 (KPF), 2024 WL 3330305, at *13 (S.D.N.Y. July 8, 2024) (finding "use of [service] by [Petitioners] as 'authorized users' on accounts other than their own after [receiving email notice of the updated terms and after] the [updated] Terms came into effect could plausibly constitute acceptance of those terms"). Plaintiff Fuentes therefore agreed to the 2023 Terms of Use.

**Plaintiff Whalen.** Plaintiff Whalen agreed to the 2023 Subscriber Agreement when he purchased League Pass on October 28, 2023. The 2023 Subscriber Agreement stated in the first paragraph: "BY ACCESSING A SERVICE, YOU AGREE TO BE BOUND BY THIS SUBSCRIBER AGREEMENT AND THE DOCUMENTS REFERRED TO HEREIN, INCLUDING, BUT NOT LIMITED TO, THE SITE TERMS OF USE AND THE NBA.COM NETWORK PRIVACY POLICY." (Ex. 5 at 1.) The blue, capitalized letters linked to the 2023 Terms of Use. Again, the references to the 2023 Terms of Use "(1) were clear and unequivocal, (2) were called to Plaintiff's attention, and (3) because a hyperlink to [the 2023 Terms of Use was] conspicuously embedded into the [2023 Subscriber Agreement], [the 2023 Terms of Use] [were] known or readily available to Plaintiff." *Wilson*, 2024 WL 1355492, at *8 (separate policy incorporated by reference into a business's terms of use presented on the internet). Plaintiff Whalen, like Plaintiff Fuentes, therefore agreed to the 2023 Terms of Use.

### C. <u>Plaintiffs' Claims Are Governed by the Arbitration Agreement</u>

Plaintiffs' claims fall within the scope of the arbitration agreement. "[W]here the contract contains an arbitration clause, there is a presumption of arbitrability," and "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986); *see also Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418 (2019) (observing that the Supreme Court has "repeatedly held that ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration").

In keeping with this principle of broad interpretation, the language "arising out of" contained in an arbitration agreement is interpreted broadly and "reach[es] all aspects of [the Parties'] relationship." *Schoenduve Corp. v. Lucent Techs., Inc.*, 442 F.3d 727, 732 (9th Cir. 2006); *see also Bd. of Trs. of IBEW Loc. No. 640 v. Cigna Health & Life Ins. Co.*, No. 21-16424, 2022 WL 2805111, at *1 (9th Cir. July 18, 2022) ("[T]he use of both 'arising out of' and 'relating to' indicates that the 'parties intended to include a broad arbitration provision'." (citation omitted)); *Clements v. T-Mobile USA, Inc.*, 712 F. Supp. 3d 1290, 1299 (N.D. Cal. 2024) ("The Arbitration Agreement is broad, encompassing all disputes with T-Mobile 'in any way related to or concerning' the Arbitration Agreement with T-Mobile, devices or services provided by T-Mobile, or T-Mobile's privacy policy"); *see also Vasell v. SeatGeek, Inc.*, No. 24-CV-00932 (NCM), 2025 WL 240912, at *7 (E.D.N.Y. Jan. 17, 2025) ("[T]he Arbitration Agreement applies to 'any dispute, claim, or controversy' between the user and [defendant] . . . [b]y its terms, the Arbitration Agreement therefore covers alleged violations of [the statutory provision plaintiff brought a claim under]").

Here, the 2023 Terms of Use apply to Plaintiffs' "access and use of the digital platforms of the" NBA including the "nba.com" and "apps (e.g., mobile apps, tablet apps)." Plaintiffs' claims are premised entirely on their access and use of the App and the alleged third-party disclosures through the App. (*See* Compl. ¶¶ 107-20.) They therefore fall within the plain applicability of the 2023 Terms of Use.

Further, the arbitration agreement specifically applies to any "Dispute" between Plaintiffs and the NBA, which is "interpreted broadly" to include "a dispute, claim, or controversy **arising out of or in connection with your access to, and/or use of, the Site**, **and/or the provision of content, services, and/or technology on or through the Site, and/or your relationship with us**, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory." (Ex. 4 at 20.) The term "Dispute" applies to "claims that arose before these Terms of Use or any prior agreement." (*Id.*) Plaintiffs' claims constitute a "Dispute" subject to arbitration under this definition. They "arise out of or in connection with" Plaintiffs' "access to" and "use of" the "Site," the definition of which includes the App because they are premised entirely on Plaintiffs' use of the App. (Compl. ¶¶ 107-20.) The claims also arise out of the NBA's provision of "content, services, and/or technology on or through the" App and Plaintiffs' "relationship" with the NBA, (Ex. 4 at 20), as they allege that the NBA made certain third-party disclosures in connection with providing Plaintiffs' access to videos on the App. (Compl. ¶¶ 107-20.) Moreover, the claims are based on a federal

statute—the Video Privacy Protection Act. (*Id.* ¶¶ 137-48.) Therefore, Plaintiffs' claims fall within the scope of the arbitration agreement.[2]

## II. THIS ACTION MUST BE STAYED PENDING ARBITRATION

Under the FAA, in any lawsuit "referable to arbitration," as here, the court "*shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3 (emphasis added). As the Supreme Court recently held: "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024). The plain statutory language thus "overrides any discretion a district court might otherwise have had to dismiss a suit." *Spizzirri*, 601 U.S. at 477. Because Plaintiffs' claims must be arbitrated and the NBA has requested a stay, this action must be stayed pending the outcome of any arbitration.

## CONCLUSION

For the reasons above, the NBA respectfully requests that if the Court does not transfer this action to SDNY, that Plaintiffs be compelled to arbitrate their claims on an individual basis before NAM.

---

[2] Although they filed the Complaint as a putative class action, Plaintiffs agreed under the 2023 Terms of Use not to participate in a class action, whether in arbitration or court. (*See supra* at 8; Ex. 4 at 28.) Accordingly, Plaintiffs must pursue their claims in arbitration on an individual basis in light of the class and collective action waiver in the 2023 Terms of Use.

DATED: April 28, 2025

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ *James Y. Pak*
James Y. Pak

JAMES Y. PAK (SBN 304563)
james.pak@skadden.com
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

MICHAEL W. McTIGUE JR. (*pro hac vice*)
michael.mctigue@skadden.com
MEREDITH C. SLAWE (*pro hac vice*)
meredith.slawe@skadden.com
ANDREW D. QUINN (*pro hac vice*)
andrew.quinn@skadden.com
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Attorneys for Defendant,
NBA Properties, Inc.